IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

**Mark E. Callan,**

        Plaintiff,

v.

**CITY OF DOVER, a municipal corporation, and ANTHONY DePRIMA, in his individual and official capacities,**

        Defendants.

Civil Action No. 12-203-RGA

MEMORANDUM OPINION

Timothy J. Wilson, Esq., The Wilson Firm, LLC, Newark, DE, Attorney for the Plaintiff.

Daniel A. Griffith, Esq., Whiteford Taylor Preston, LLC, Wilmington, DE, Attorney for the Defendants.

August 26, 2014
Wilmington, Delaware

*[signature]*
ANDREWS, U.S. DISTRICT JUDGE:

Presently before the Court is Defendants' Motion for Summary Judgment. (D.I. 53). This motion arises from the Plaintiff's Family and Medical Leave Act, Americans with Disabilities Act, and § 1983 claims. (D.I. 1). This matter has been fully briefed. (D.I. 54, D.I. 55, D.I. 58). For the reasons that follow, the Defendants' Motion for Summary Judgment is **DENIED IN PART** and **GRANTED IN PART**.

I.   **Background**

Plaintiff Mark E. Callan began working as the City of Dover's Information Technology Director on February 26, 1996. (D.I. 55 at 6). The Plaintiff has been treated consistently for depression, specifically Dysthymic personality, since the mid-'80s. (D.I. 54-1 at 12). He has taken anti-depressants (including Zoloft and Lexapro) since that time. (*Id.*). The Plaintiff's wife was diagnosed with cancer in July 2002 and passed away in September 2009. (*Id.*; D.I. 55 at 6). From 2002 to 2009, the Plaintiff would intermittently take time off for family leave, family medical leave, and mental health treatment.[1] (D.I. 54-1 at 14). On July 1, 2009, just before his wife's passing, the Plaintiff received his annual performance evaluation. (D.I. 56-2 at 31). This performance evaluation was generally positive.[2] (*Id.*) The Plaintiff's performance evaluations from 2006-08 were similarly positive, with performance grades ranging from 3 to 5. (D.I. 56-1 at

---

[1] The Plaintiff accounted for his missing work by submitting it as vacation time. In the Plaintiff's deposition, he stated that he used vacation time and that he got additional vacation time in place of salary increases. (D.I. 54-1 at 14). He described this as FMLA leave. (*Id.* at 38). However, the Plaintiff asserted that he was never requested to submit FMLA paperwork until January 2010. (*Id.*). The Human Resources Director, Kim Hawkins, appeared to dispute this claim, stating that the city never put the Plaintiff on notice that he was on FMLA leave. (D.I. 56-5 at 6-7). She also stated that she had never requested the Plaintiff to submit FMLA paperwork prior to January 13, 2010. (*Id.* at 8). Thus, it appears that the parties agree that no FMLA formalities were followed before January 13, 2010. Mr. Callan considered the pre-2010 leave to be FMLA leave; the City did not.

[2] The performance evaluations use a grading scale of 1 to 5, with 5 being the highest possible rating. (D.I. 56-2 at 32). The Plaintiff's July 2009 performance evaluation contained grades ranging from 2 to 5, with the majority being 3 and above. (*Id.* at 33-39). There was only one grade of 2 received. (*Id.*).

1

38-55; D.I. 56-2 at 1-44). Following his wife's passing, the Plaintiff began to miss work on a frequent, less predictable basis. (D.I. 54-1 at 47).

On January 8, 2010, the Plaintiff met with Anthony DePrima, the City Manager, for one of their monthly meetings. (D.I. 54-1 at 21). During this meeting, DePrima brought up exit interviews by two of the IT department's former employees, Lorri Moore and Aaron Officer. (*Id.* at 22). The first exit interview was with Aaron Officer on July 10, 2009.[3] (D.I. 54-3 at 2-5). Officer's exit interview revealed displeasure with the Plaintiff's micro-management. (*Id.*). Officer indicated that morale among the employees was excellent with the supervisor (the Plaintiff) removed. (*Id.*). Officer also stated that he would have stayed with the City of Dover if a different leader were in place. (*Id.*). Finally, Officer provided his account of the events leading to his early dismissal.[4] (*Id.* at 4). According to Officer, he had only limited conversations with the Plaintiff following his two weeks' notice. (*Id.*). Shortly after his resignation notice, he requested the need for vacation, which the Plaintiff did not approve. (*Id.*). Officer subsequently called in sick instead. (*Id.*). On July 10, 2009, Officer asked the Plaintiff for the protocol for submitting his ID badge and keys. (*Id.*). The Plaintiff informed Officer that he would submit them the following Monday. (*Id.*). Officer indicated on his resignation letter that his last day was Friday, July 10. The Plaintiff stated that "if he was professional," Officer would work through Monday. (*Id.*). After some additional words, Officer went back to his desk. (*Id.*). The Plaintiff dismissed Officer shortly thereafter. (*Id.*). Officer also noted that the Plaintiff had raised his voice during their confrontation. (*Id.*). The Plaintiff, in an email to Hawkins, gave a different account of the events leading to Officer's early dismissal. (*Id.* at 4-5). According to the Plaintiff, when Officer had requested the leave procedures, the

---

[3] Aaron Officer had resigned his position to accept another similar employment opportunity at Del. Tech.

[4] The Plaintiff had dismissed Officer before the end of the work day on July 10.

Plaintiff reminded Officer that in exchange for granting his vacation, Officer agreed he would extend his time to the Monday after July 10. (*Id.*). Officer subsequently "gave him attitude" and walked out. (*Id.*). After waiting for Officer to come back with a "better attitude," which he did not, the Plaintiff dismissed him. (*Id.*). The Plaintiff also indicated that there were others present who could corroborate that there was no yelling between the two of them. (*Id.*).[5]

The second exit interview, performed on December 14, 2009, was with Lorri Moore. (D.I. 54-2 at 2). During her interview, Moore expressed dissatisfaction with the lack of teamwork between the IT staff and the IT Director (the Plaintiff). (*Id.*). Moore also indicated that the discipline in the department was inconsistent and largely depended on the Plaintiff's mood. (*Id.*). Similarly to Officer, Moore described the department's morale as positive with the Plaintiff removed, and poor when including the Plaintiff. (*Id.*). Further, like Officer, Moore stated that she would have stayed longer with the department had there been a different IT director in place.[6] (*Id.* at 3). Moore also indicated that the Plaintiff influenced her decision to leave, as she "wasn't going to let Mark get her pension." (*Id.*). Kim Hawkins, the Human Resources Director and interviewer, noted that the Plaintiff yelled at both the staff and the vendors. (*Id.* at 4). Hawkins also suggested that further discussions with both the IT staff and the Plaintiff were needed following both Moore and Officer's exit interviews. (*Id.*). Finally, Hawkins wrote that action may need to be taken towards the Plaintiff if the staff's comments were consistent and could be validated. (*Id.*).

After his meeting with DePrima, the Plaintiff met with Hawkins on January 13 and informed her that he was receiving counseling and taking medication for depression. (D.I. 56-5 at 7). Hawkins subsequently notified the Plaintiff that either he or his medical provider would have to

---

[5] It appears that this was never confirmed.

[6] Moore retired. (*Id.*).

fill out FMLA paperwork. (*Id.*). Hawkins received the Plaintiff's FMLA paperwork on January 19, and the City of Dover approved the Plaintiff's application on January 20. (D.I. 54-5 at 2-5; D.I. 56-5 at 8). Hawkins also suggested to the Plaintiff that he inform DePrima of his health issues. (*Id.* at 7; D.I. 56-7 at 1).

On January 22, 2010, Hawkins and DePrima held a meeting with the IT staff, to which the Plaintiff was not invited. (D.I. 56-5 at 16). Notes from this meeting corroborate both Officer and Moore's prior statements regarding the Plaintiff's micro-management and temper. (D.I. 54-6 at 2, 3). On January 25, DePrima and Hawkins met with the Plaintiff to discuss the IT staff's comments from the January 22 meeting. (D.I. 56-5 at 19-20). Following the meeting, the Plaintiff went home and the next day sent an email to his staff, explaining his absence from work the previous day, as well as his mental condition following his wife's passing. (D.I. 54-1 at 29; D.I. 54-8 at 2). On January 26, the same day the Plaintiff sent his IT staff the email, the Plaintiff met with DePrima.[7] (D.I. 54-1 at 30). According to the Plaintiff, DePrima was upset that the Plaintiff had sent the email, that he had not given the Plaintiff the rest of the 25th off, and was docking him pay for the hours missed from the 25th and 26th. (*Id.*).

DePrima and Hawkins had similar meetings with the IT staff on February 24, 2010, May 19, 2010, and July 20, 2010. (D.I. 54 at 6). DePrima and Hawkins also had follow-up meetings with the Plaintiff to discuss the IT staff's concerns. (*Id.*). Following the February 26 meeting, DePrima requested that the Plaintiff subsequently submit a twelve bullet point action plan regarding how to improve the department. (*Id.*; D.I. 54-10 at 2). During a follow-up meeting on May 21, DePrima graded the Plaintiff's improvement as a 2 on a scale of 1 to 10. (D.I. 56-2 at 55).

---

[7] The record is unclear as to whether this meeting was in person or via phone. (D.I. 54-1 at 30).

4

On June 14, 2010,[8] DePrima and Hawkins conducted their annual performance evaluation regarding the Plaintiff. (*Id.* at 45). The performance evaluation was largely negative, with grades of 1 and 2. (*Id.* at 46-48). The Plaintiff disagreed with DePrima's June 14 evaluation and responded with a rebuttal on June 25. (D.I. 54-12 at 2-9). The Plaintiff also requested permission to take his appeal to the City Council if an agreement could not be reached with DePrima. (D.I. 54-13 at 2). DePrima responded, stating the appeal was timely, and noting that he would consider any communication to the City Council to be an act of insubordination. (*Id.*).

The July 20 meeting and subsequent follow-up further revealed the Plaintiff's failure to improve. (D.I. 54-14 at 2-3; D.I. 54-15 at 2-3). After which, the Plaintiff informed Hawkins and DePrima that their follow-up meeting was "extremely difficult" for him, and that he was taking time off because of stress, using FMLA leave. (D.I. 54-16 at 2). On July 23, 2010, Plaintiff's attorney wrote DePrima a letter regarding his treatment of the Plaintiff. (D.I. 54-17 at 2). Six days later, on July 29, 2010, DePrima informed the Plaintiff that he was being reassigned, on an interim basis, to the position of Senior City Administrator. (D.I. 54-18 at 2). This reassignment resulted in the Plaintiff's salary dropping from $95,128.18 to $73,581.00 per year. (D.I. 56-3 at 18). According to the letter, DePrima's decision was the result of the Plaintiff's failure to improve his management practice, as well as concerns regarding employee discontent and retention. (D.I. 54-18 at 2).

On or about July 31, 2010, the Plaintiff was in a motorcycle accident, resulting in personal injuries, causing the Plaintiff to miss work. (D.I. 54 at 8; D.I. 56-6 at 27). While the Plaintiff was in

---

[8] Both parties agree that the Plaintiff's performance evaluation was on June 14, 2010. Plaintiff's counsel has submitted in the appendix to its answering brief a copy of this evaluation. (D.I. 56-2 at 45). This document conflicts with the Defendant's copy of the evaluation submitted in its opening brief, which notably has a print date of July 16, 2010, which is different from the above print date of June 14, 2010. (D.I. 54-11 at 2). The Court also notes that the evaluation date for both documents is July 1, 2010, and the evaluation period for both documents is from July 1, 2009 to June 30, 2010.

5

rehab, DePrima came to visit the Plaintiff. (D.I. 56-1 at 28). During this visit, DePrima informed the Plaintiff that he had no additional projects to assign him, and that the Plaintiff could either retire and keep his unemployment benefits, or be terminated. (*Id.*).

On November 14, 2010, while the Plaintiff was still hospitalized, he informed DePrima and Hawkins that he would be released to work in December. (D.I. 56-1 at 37; D.I. 56-6 at 28). Two days later, on November 16, DePrima informed the Plaintiff that he was relieving him of his duties, citing a reduction of force as the reason. (D.I. 56-7 at 5). On November 22, Hawkins sent a formal letter to the Plaintiff, reiterating DePrima's previous termination notice, effective November 30, as well as indicating to the Plaintiff the option of retirement. (D.I. 54-19 at 2). According to his complaint, the Plaintiff has exhausted all administrative remedies, and been granted a Right to Sue. (D.I. 1 at 8). On February 20, 2012, the Plaintiff filed this lawsuit. (*Id.* at 1). The Defendants filed the instant motion on April 17, 2014. (D.I. 53 at 1).

## II.  Legal Standard

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The moving party bears the burden of proving the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). A party asserting that a fact cannot be or is genuinely disputed must either cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or show that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A) & (B). If the moving party has

met its burden, the non-moving party must provide specific facts showing that there is a genuine issue for trial. *Matsushita,* 475 U.S. at 587. In determining whether there is a genuine issue of material fact, courts resolve all factual disputes and draw all reasonable inferences in favor of the nonmoving party. *Conoshenti v. Public Service Elec. & Gas Co.,* 364 F.3d 135, 140 (3d Cir. 2004).

## III. Discussion

### a. Family and Medical Leave Act Claims

Congress enacted the Family and Medical Leave Act in 1993 to help employees balance the demands of the workplace with the needs of families. 29 U.S.C. § 2601(b)(1). It entitles employees to take reasonable leave for medical reasons and for the care of a spouse who has a serious medical condition. 29 U.S.C. § 2601(b)(2). It accomplishes this purpose in a manner that accommodates the legitimate interests of employers. 29 U.S.C. § 2601(b)(3). There are two types of claims under the FMLA: interference and retaliation claims, the second of which is presented here. *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.,* 691 F.3d 294, 301-12 (3d Cir. 2012). In examining retaliation claims, courts utilize the burden shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-03 (1973). Under this approach, the plaintiff has the initial burden of showing that his employer retaliated against him for exercising his FMLA rights. *Lichtenstein,* 691 F.3d at 301-02. The burden then shifts to the employer to articulate a non-discriminatory reason for the adverse employment decision. *Id.* at 302. Once the employer adequately meets this showing, the burden shifts back to the plaintiff who must prove by a preponderance of the evidence that the employer's explanation is a pretext for discrimination. *Id.*

The employee must first establish a *prima facie* case by providing evidence showing that: (1) he or she availed himself or herself of a protected right under FMLA; (2) he or she was

7

adversely affected by an employment decision; and (3) there was a causal connection between the employee's protected activity and the employer's adverse employment action. *Lichtenstein*, 691 F.3d at 302.

The first prong requires the employee to give adequate notice to his employer about his need to take leave. 29 U.S.C. § 2612(e)(2). This notice requirement is construed liberally and is generally a question of a fact, not law. *Lichenstein*, 691 F.3d at 303. The Plaintiff asserts that he invoked his FMLA rights when he submitted FMLA paperwork per Hawkins' request in January 2010, when he took time off following the July 20 meeting with DePrima and Hawkins, and when he took medical leave because of his motorcycle accident. On each of these occasions, the Plaintiff gave notice to Hawkins that he was taking FMLA leave. None of these facts are in dispute. The adverse employment decisions occurred following each of the above instances, including the reassignment with lower pay, and the termination. The Court now turns to the third factor.

In determining whether there is a sufficient evidence of a causal link to survive a motion for summary judgment, courts consider a broad array of evidence. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 283-84 (3d Cir. 2000). The Third Circuit has established that when the temporal proximity between the protected activity and adverse action is unduly suggestive, it is sufficient, standing alone, to create an inference of causality and defeat summary judgment. *LeBoon v. Lancaster Jewish Cmty. Center Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007). Where the temporal proximity is not unusually suggestive, courts ask whether the proffered evidence, when looked as a whole, may suffice to raise the inference. *Id.* at 232.

The Plaintiff asserts several instances of temporal proximity that he believes are highly suggestive of the Defendants retaliating against the Plaintiff for invoking his FMLA rights. (D.I. 55 at 19). First, the Plaintiff points to the Defendants' investigation starting January 22, 2010,

which was three days after he submitted his FMLA paperwork on January 19. (*Id.*). Further, the Plaintiff asserts that the Defendants first requested he submit FMLA paperwork on January 13, 2010, following the change in nature of his FMLA leave. (*Id.*). Here, the Court does not find the temporal proximity of these examples to be unduly suggestive. The Defendants' investigation into the Plaintiff's performance began shortly after DePrima discussed with the Plaintiff complaints revealed in the exit interviews, the most recent of which was in December 2009. (D.I. 54-3 at 2). It logically follows that an employer may wish to undertake an investigation or apply more stringent monitoring and review of an employee against whom complaints were received.

While the temporal proximity of the above examples is not unduly suggestive, there are other instances that do weigh in favor of finding causation. For instance, on June 14, 2010, the Plaintiff submitted a rebuttal to DePrima regarding his most recent performance evaluation. One month later, on July 23, 2010, the Plaintiff's attorney sent a letter to DePrima regarding the Plaintiff's FMLA rights. On July 29, DePrima notified the Plaintiff that he was reassigning him to a different position. The Plaintiff's reassignment was only six days after his attorney sent DePrima a complaint letter. In *Lichenstein*, the retaliatory action occurred seven days after the plaintiff invoked her FMLA rights. 691 F.3d at 307. The court found this to be in line with other cases finding two days to three weeks to be sufficient regarding temporal proximity. *Id.* Therefore, when viewed in a light most favorable to the Plaintiff, the proximity of these events favor an inference of causation sufficient to meet the third factor.

The Defendants argue that the Plaintiff's demotion and subsequent termination were related to the exit interviews and the Plaintiff's failure to improve despite multiple complaints. As previously mentioned, following the second exit interview, the Defendants began to closely monitor the Plaintiff's performance. After a number of meetings, the Defendants noted the

9

Plaintiff's failure to improve, which was pointed out to the Plaintiff during the July 21 meeting. On July 29, he was reassigned on an interim basis. The Defendants assert that the existence of this position was temporary and dependent on the amount of work available for the Plaintiff. (D.I. 54 at 8). A few months later, the Defendants terminated the Plaintiff's employment. The Defendants considered the Plaintiff's termination a "reduction in force," reasoning that there were insufficient projects to justify continuing his position. (*Id.*).

In arguing that the Defendants' explanation is a pretext for discrimination, the Plaintiff must point to evidence, direct or circumstantial, that could lead a factfinder to either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the Defendant's actions. *Fuentes v. Perskie*, 32 F.3d 759, 763-65 (3d Cir. 1994). Here, the Plaintiff emphasizes genuine issues of material facts concerning his reassignment and termination. Specifically, the Plaintiff points to the two exit interviews, the less favorable treatment when compared to a similarly situated supervisor,[9] the Defendant's failure to conduct any investigation despite a recognized duty to do so, and the asserted "reduction in force" explanation for his termination. (D.I. 56 at 15-21). Regarding the exit interviews, even when viewed in a light most favorable to the Plaintiff, the record clearly indicates that Officer and Moore cited the Plaintiff as being a major reason for their discontent with the IT department. Further, the complaints made during the "secret meetings" were more than just petty concerns, but rather were legitimate grievances related to the Plaintiff's actions. Similarly, the Court does not find there to be any genuine issues regarding the difference in treatment between the Plaintiff and the similarly situated supervisor (Townsend). As Hawkins explained, the complaint relating to Townsend did not rise to the same level as the present case.

---

[9] This is referring to the complaints made to Anne Marie Townsend, another supervisor with the City of Dover. (D.I 56-5 at 15).

10

(D.I. 56-5 at 15). There, the similarly situated supervisor (Townsend) was the one receiving the complaint, not the one against whom the complaint was filed. (*Id.*). The record also indicates that Townsend took adequate measures to deal with the complaint and therefore did not need the HR Department's assistance. (D.I. 56-7 at 2). Further, as opposed to two complaints against the Plaintiff, there was only one complaint in the Townsend situation. (D.I. 56-5 at 15).

The Court does have concerns with the Defendants' lack of investigation and the reasoning for the Plaintiff's termination, the "reduction in force." The Defendants' lack of investigation into the Plaintiff's FMLA complaints, especially when compared to its extensive investigation into the IT staff's complaints, indicates a difference in treatment calling into question the Defendant's aggregate treatment of the Plaintiff. In addition, a reduction in force that results in a single employee being terminated also suggests a lack of credibility regarding this explanation for the Plaintiff's termination. The Defendants provide no rebuttal to the lack of investigation claim. Regarding the "reduction in force," the Defendants assert that it was characterized as such in order to enable the Plaintiff to obtain unemployment insurance. (D.I. 58-6 at 28, 29). However this does little to support the Defendants' position that the Plaintiff's termination was non-discriminatory. In light of the factors discussed above, the court finds, drawing all inferences in favor of the Plaintiff, that the evidence provided establishes genuine issues of fact regarding the circumstances leading to the Plaintiff's reassignment and termination.

### b. Americans with Disabilities Act Claims

The Americans with Disabilities Act of 1990 prohibits covered entities from discriminating against "qualified individuals" with a disability, because of that disability, with regard to discharge of employees. 42 U.S.C. §12112(a). In addressing disability discrimination claims, courts use the *McDonnell Douglas* burden shifting framework. *See Raytheon Co. v.*

11

*Hernandez*, 540 U.S. 44, 49-50 (2003). A *prima facie* case under the ADA requires the plaintiff to demonstrate that: (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an adverse employment decision as a result of discrimination. *Gaul v. Lucent Tech, Inc.*, 134 F.3d 576, 580 (3d Cir. 1998). If a plaintiff can establish a *prima facie* case for disability discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment decision. *Fuentes,* 32 F.3d at 763. Accordingly, if the employer is able to meet this burden, the burden of proof shifts back to the plaintiff. *Id.* The plaintiff must then show by a preponderance of the evidence that the employer's reasoning is a pretext for determination. *Id.* This requires a showing that not only was the employer's explanation false, but that discrimination was the real basis of the employer's adverse employment action. *Id.* at 763-65. The test is whether a reasonable factfinder could rationally find the employer's explanation unworthy of credence. *Id.* at 764.

The Court first looks at whether the Plaintiff has established a *prima facie* case. The Defendants have conceded the second factor.[10] Therefore, this matter turns on the first and third elements.

The ADA defines a disability, with respect to an individual, as (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment. 42 U.S.C. §12102(1). The ADA further instructs courts to construe the definition of disability in favor of broad coverage of individuals. 42 U.S.C. §12102(4)(A). In his Amended Complaint, the Plaintiff asserts that he is disabled as his mental state has substantially limited his performing major life

---

[10] Neither party has briefed this factor. The Court, therefore, need not address this issue.

activities, including, but not limited to: thinking, concentrating, sleeping, caring for himself, and interacting with others. (D.I. 3-1 at 3, n. 15). As the Defendants have correctly indicated, "transitory, temporary or impermanent impairments are not considered an impairment that substantially limits major life activities." *Rineheimer v. Cemcolift Inc.*, 292 F.3d 375, 380 (3d Cir. 2002); 42 U.S.C. §12102(3)(B). The ADA defines a transitory impairment as an impairment with an actual or expected duration of 6 months or less. 42 U.S.C. §12102(3)(B).

In his deposition, the Plaintiff indicates treatment for depression dating back to the mid-80s. (D.I. 54-1 at 11, 40:20). The Plaintiff also states that from 2002 to 2009, he took time off not only to take care of his wife, but also to take care of himself and his mental issues. (*Id.* at 14, 49:10-12, 50:23-51:6). In addition, the city manager who preceded DePrima was apparently aware of the hospital the Plaintiff put himself in for depression. (*Id.* at 14, 51:12-15). Further, the Plaintiff informed Hawkins of his mental condition, and accordingly filled out FMLA paperwork. (D.I. 54-5 at 2; D.I. 56-5 at 22:10-23:13). Drawing all inferences in favor of the Plaintiff, the Court finds that a reasonable jury could find that the Plaintiff is "disabled" within the meaning of the ADA.

The Court now turns to the third element, whether the Plaintiff suffered an adverse employment decision as a result of discrimination. However, the parties' briefs focus on the discrimination portion of the burden-shifting framework rather than the causation prong for establishing a *prima facie* ADA claim. For this reason, the Court will assume *arguendo* that the Plaintiff has met the third factor, despite the thinness of evidence to support this contention.

The Defendants assert that the main impetus for the Plaintiff's dismissal was the exit interviews conducted in July 2009 and December 2009. Following these interviews, the Defendants began paying closer attention to the Plaintiff's management of the IT department. When little improvement was shown, the Defendants demoted and subsequently terminated the

13

Plaintiff. As mentioned above, in order to survive summary judgment, the Plaintiff must show that the exit interviews and the Plaintiff's poor managerial abilities were a pretext for his dismissal. Further, the Plaintiff must point to evidence sufficient to convince the court that discrimination was the real basis for the Defendants' decision to terminate his employment.

In response, the Plaintiff incorporates the same arguments used to defend against summary judgment regarding the FMLA claim. (D.I. 55 at 22). First, the Plaintiff points to the change in the Defendants' treatment towards him once the nature of his FMLA leave altered. (D.I. 55 at 14). However, as previously indicated, the timeline of the exit interviews lend credence to the Defendants' heightened monitoring of the Plaintiff. Second, the Plaintiff argues that there are genuine issues of material fact regarding the exit interviews. (*Id.* at 16). As the Court has already noted, there is little doubt that the Plaintiff's employees had significant grievances against him that warranted intervention. Any factual disputes are immaterial. Finally, the Plaintiff points to the Defendant's failure to conduct adequate investigation and the weakness in the Defendant's "reduction in force" argument. (*Id.* at 20, 21). Regarding the Defendants' lack of investigation and "reduction in force" explanation for the Plaintiff's dismissal, the Court finds there to be issues regarding the legitimacy of this reasoning. However, the Plaintiff must also show that discrimination was the basis of the Defendant's employment action. While the Court questions the legitimacy of the Defendants' need to reduce the workforce as the reason for terminating the Plaintiff's employment, it does not necessarily follow that discrimination was the impetus for this decision. This is especially so, whereas here, the Plaintiff has submitted little evidence to support its belief that the Defendants discriminated against him on the basis of his disability. Significantly, the Plaintiff has stated that the Defendants have been aware of his disability since at least 2002. However, no adverse employment decision was taken until 2010. The Plaintiff offers no direct

evidence that his disability was the real reason for his reassignment and eventual termination. For these reasons, and after a careful review of the record, the Court finds that the Plaintiff has not met his burden to defeat the summary judgment motion regarding his ADA claim.

### c. § 1983 Claim

The Plaintiff also asserts a claim arising under 42 U.S.C. § 1983. (D.I. 3-1 at 10-12). A majority of courts have held that FMLA provides the exclusive means of recovery for violation of rights created by FMLA. *See Hayduk v. City of Johnstown,* 580 F. Supp. 2d 429, 485 (W.D. Pa. 2008), *aff'd*, 386 F. App'x 55 (3d Cir. 2010). The Plaintiff cites a single case, *Knussman v. State of Maryland,* 16 F. Supp. 2d 601, 609-10 (D. Md. 1998), to support its argument that the two statutory recovery means do not conflict. (D.I. 58 at 11). This single reference to a case decided in 1998 does not persuade me to disagree with the substantial weight of recent case law ruling otherwise. *See Hayduk,* 580 F. Supp. 2d at 485.

## IV. Conclusion

For the reasons discussed above, the Defendants' Motion for Summary Judgment is **DENIED IN PART** and **GRANTED IN PART**. (D.I. 53). The Defendants' motion regarding the Plaintiff's claim under the Family and Medical Leave Act is **DENIED**. The Defendants' motion regarding the Plaintiff's Americans with Disabilities Act and § 1983 claims are **GRANTED**. A separate order will be entered.